UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
3:19-CR-243-MOC-DCK-1

| | |
|---|---|
| **UNITED STATES OF AMERICA**, ) | |
| ) | |
| ) | |
| Vs. ) | **ORDER** |
| ) | |
| **JEREMIAH V. PITTS**, ) | |
| ) | |
| Defendant. ) | |
| ) | |

**THIS MATTER** is before the Court on Defendant's Motion to Suppress. (Doc. No. 36). Having considered Defendant's motion, reviewed the pleadings, and conducted an evidentiary hearing, the Court enters the following findings, conclusions, and Order denying Defendant's motion.

## FINDINGS AND CONCLUSIONS

### I. Background

At approximately 10:39 a.m. on February 23, 2017, Defendant was driving a rented Ford Mustang with Louisiana plates on I-80 Eastbound, near Clearfield, Pennsylvania. Pennsylvania Trooper Petrof pulled Defendant over for changing lanes without a turn signal and tailgating other vehicles—both traffic violations in Pennsylvania. The dashboard camera mounted on Trooper Petrof's patrol vehicle (the "dash cam") clearly shows a Ford Mustang with a Louisiana registration change from the passing lane to the driving lane between two vehicles without a turn signal, and then speeding forward towards the SUV in front of the Mustang.

Defendant pulled the rented Ford Mustang onto the shoulder of I-80. Trooper Petrof approached Defendant's rental car from the passenger side. Trooper Petrof put his head inside

1

the open passenger window to ask Defendant for his driver's license, registration, and insurance card. Trooper Petrof advised Defendant that their encounter was being recorded. Trooper Petrof immediately smelled marijuana and can be heard on the recording asking Defendant, "How much weed is in the car. I smell marijuana. I smell it right now." Defendant responded that he had a "blunt" in the car. Trooper Petrof replied, "Just a blunt, nothing else in there?"

Trooper Petrof directed Defendant to exit the rental car. He then asked Defendant: "Where are you coming from?" Defendant replied that he was coming from Cleveland and driving to Atlantic City to gamble. Defendant also volunteered that he had $50,000 in the car. Trooper Petrof asked Defendant to exit the rental car because "in Pennsylvania you can't have any weed." Trooper Petrof told Defendant he was going to deploy the drug dog in his patrol vehicle to sniff Defendant's rental car for the presence of illegal drugs. Trooper Petrof further stated: "The money is a problem; you've got drugs in the car."

Trooper Petrof then explained how drug detection dogs are used to determine whether currency has been in the recent presence of illegal substances. Trooper Petrof patted Defendant's clothing for any weapons. Before the pat-down, Trooper Petrof asked Defendant: "Anything on your person?" Defendant responded: "Can I just tell you where everything is?" Defendant then told Trooper Petrof he had more marijuana in a black bag on the rear seat of the rental car. During the pat-down, Defendant pulled a large wad of credit and gift cards from his pants pockets. Trooper Petrof then directed the defendant to stand in front of his patrol car while he verified Defendant's driver's license and registration and arranged for the search of Defendant's rental car.

Inside his patrol car, Trooper Petrof called the Pennsylvania State Police ("PSP") dispatcher to request back-up during his search of Defendant's vehicle. Trooper Matthew

Peacock arrived at the scene approximately seven minutes later. Meanwhile, Trooper Petrof relayed Defendant's driver's license and registration information to the dispatcher and told her the reason for his stop now included a drug violation.

Defendant stood unrestrained in front of Trooper Petrof's patrol car during this time. After Trooper Petrof briefed Trooper Peacock, he directed Defendant to stand in front of the rental car with Trooper Peacock. Defendant and Trooper Peacock stood on the side of the interstate in front of Defendant's rental car and in view of Trooper Petrof's dash cam. Trooper Peacock removed State Police Drug Detection ("SPDD") K-9 Eric from his patrol car and directed Eric in a sniff of Defendant's rental car. SPDD K-9 Eric was certified on the detection of the odor of marijuana, among other drugs. Eric alerted on the car's center console and on a backpack on the rear seat. Trooper Petrof then conducted a hand search of the rental car, where he discovered a rolled marijuana joint in the center console. Trooper Petrof removed the backpack from the car and searched it by hand. Inside the backpack, Trooper Petrof found marijuana, approximately $65,000 in U.S. currency, numerous credit cards, gift cards, money orders, jewelry, and electronic items, including a credit card reader.

During the search, Trooper Petrof commented, "You don't mix all your money in the same bag with the weed. Normal people don't do that and don't package the money in the way it is all wrapped up." Defendant replied: "I didn't want it to get damaged (referring to the money)." When asked why he had so many credit cards, Defendant replied: "You get points."

When Trooper Petrof completed his search of the rental car, he placed Defendant under arrest for possession of marijuana. Trooper Petrof did not restrain Defendant, but instead allowed him to drive his rental vehicle to the nearby PSP station in Clearfield, Pennsylvania. While at PSP Clearfield, Defendant was read his Miranda rights and completed a PSP Custodial Written

Statement, waiving his right to remain silent and have counsel present. Defendant was questioned about the numerous credit cards in his possession, as well as the money grams and electronic equipment. He gave vague answers. When specifically asked why he had so many credit cards, Defendant said he "does it for the cash back points or the money they offer you when you open an account." Trooper Petrof asked Defendant how he obtained over $50,000 in cash. Defendant replied he had "taken money grams out from Walmart with some credit cards he has and has been saving it up." Id.

When pressed on whether he made payments on his credit debt with so many accounts, Defendant answered, "Not all the time." Defendant estimated he had around $50,000 in debt. In his written statement, Defendant wrote: "To Whom It May Concern: The following statement, is to determine that my cash assets and uncashed checks was obtained thru legal means, whether by credit card advances or paycheck from AbbVie Clinical or other clinical laboratories."

Defendant was charged by criminal complaint with possession of a "personal use" amount of marijuana in violation of the Pennsylvania Controlled Substance, Drug, Device, and Cosmetic Act. 35 PA. Stat. Ann. § 780-113(a)(31)(i) and (g) (West). Section 780-113(a)(31)(i) prohibits "the possession of a small amount of marijuana only for personal use," which is a misdemeanor punishable by imprisonment not exceeding thirty days, or a fine not exceeding five hundred dollars ($500), or both. Id. Defendant was also charged with a violation of Title 75, Pennsylvania Vehicle Code, Section 3334(a) which states:

> Upon a roadway no person shall turn a vehicle or move from one traffic lane to another or enter the traffic stream from a parked position unless and until the movement can be made with reasonable safety nor without giving an appropriate signal in the manner provided in this section.

4

75 Pa. Stat. and Cons. Stat. Ann. § 3334 (West). See (Doc. No. 41-1: Gov't Ex. 1: Pennsylvania Police Criminal Complaint No. PA17-186920 and Affidavit of Probable Cause). On April 2, 2019, Defendant was convicted of these offenses in a jury trial held in Clearfield County.

Before his release, Defendant was provided with an inventory of his seized property, which included $65,319 in U.S. currency, as well as electronic devices, a swiss watch, necklace, and assorted credit cards and money orders. Trooper Petrof signed a petition to forfeit this property. Probable cause for the forfeiture included the large amount of cash found with illegal drugs, in a rented vehicle traveling interstate, and the unusual number of credit cards and money orders.

On or about March 6, 2017, Trooper Petrof met with Special Agents Daniel Fischer and Jason Pope with the United States Secret Service's ("USSS") Pittsburgh Field Office. (USA 5412–13). Fisher and Pope opined that the evidence seized from Defendant provided probable cause that Defendant was involved in a "bust-out" scheme. A bust-out scheme is a first-person fraud in which the fraudster takes out several legitimate credit cards in his name, uses them to obtain merchandise, and then pays them off. After several cycles in which the credit lines are increased, the fraudster uses the credit cards to obtain the maximum amount of cash and/or merchandise, only to stop all payments on his credit lines. Evidence supporting probable cause for a bust-out scheme in this case included Defendant's possession of 74 magnetic cards, 38 money grams, an electronic card reader, and numerous merchandize receipts. After consultation with the Clearfield County District Attorney, it was determined that USSS would adopt Defendant's case for further investigation of credit card fraud. However, the investigation was

transferred to USSS's Charlotte Field Office because Defendant maintained a permanent residence in Charlotte, North Carolina.[1]

On August 21, 2019, Defendant charged in this district by Bill of Indictment with four counts of Mail Fraud Affecting a Financial Institution, in violation of 18 U.S.C. § 1341 (Counts One to Four); eight counts of Bank Fraud, in violation of 18 U.S.C. § 1344 (Counts Five to Twelve); and two counts of Money Laundering, in violation of 18 U.S.C. § 1957 (Counts Thirteen and Fourteen). (Doc. No. 1). Defendant pled not guilty to the charges on May 15, 2020, and Defendant was released on bond.

Defendant filed the pending motion to suppress on April 28, 2021, contending that the evidence was seized in violation of his Fourth Amendment rights. Defendant, therefore, moves to suppress all of the evidence obtained pursuant to the search. The Court held a hearing on May 18, 2021, in which the Government presented several witnesses. Defendant also testified at the hearing.

## II. Applicable Law

A traffic stop constitutes a "seizure" under the Fourth Amendment and is subject to review for reasonableness. United States v. Williams, 808 F.3d 238, 245 (4th Cir. 2015) (citing Terry v. Ohio, 392 U.S. 1, 88 (1968)). To satisfy the reasonableness requirements for an investigative detention, a traffic stop must be legitimate at its inception, and the officer's actions

---

[1] The Chief Counsel of the Pennsylvania Department of the Treasury approved the USSS's request to transfer Defendant's property. On May 16, 2017, the USSS took custody of the items seized from Defendant. On May 17, 2017, the USSS converted the U.S. currency seized from Defendant into PNC Cashiers' Check No. 7310191. See (USSS Certified Inventory of Evidence, Case No. 105 813-49523 (USSS Evidence Log), Serial No. 110-2018-49523). On June 14, 2017, Special Agent Pope created a detailed inventory of the property. See (USSS Evidence Log, Serial Nos. 110-2017-000033, 110-2107-000036, and 110-2018-000042). Defendant's property was received in the USSS's Charlotte Field Office on January 9, 2018.

6

during the stop must be "reasonably related in scope" to the basis for the stop. United States v. Hill, 852 F.3d 377, 381 (4th Cir. 2017). Observing a traffic violation provides sufficient justification for a police officer to detain the offending vehicle for as long as it takes to perform the traditional incidents of a routine traffic stop. Id. at 382. For example, a police officer may detain a subject as long as it takes to "request a driver's license and vehicle registration, run a computer check, and issue a citation." United States v. Foreman, 369 F.3d 776, 781 (4th Cir. 2004).

If a police officer wants to detain a driver beyond the scope of a routine traffic stop, however, he must possess a justification for doing so other than the initial traffic violation that prompted the stop in the first place. Florida v. Royer, 460 U.S. 491, 500 (1983). A prolonged automobile stop requires either the driver's consent or a "reasonable suspicion" that illegal activity is afoot. United States v. Branch, 537 F.3d 328, 336 (4th Cir. 2008) (citing United States v. Foreman, 369 F.3d at 781; Florida v. Royer, 460 U.S. at 500–01). The quantum of proof necessary to demonstrate "reasonable suspicion" is "considerably less than [a] preponderance of the evidence." Id. (citing Illinois v. Wardlow, 528 U.S. 119, 123 (2000)). To demonstrate reasonable suspicion, a police officer must offer "specific and articulable facts" demonstrating at least "a minimal level of objective justification" for the belief that criminal activity is afoot. Id. at 337.

While conducting the tasks associated with a traffic stop, a police officer's "questions or actions ... need not be solely and exclusively focused on the purpose of that detention." United States v. Mason, 628 F.3d 123, 131 (4th Cir. 2010). A police officer may ask questions unrelated to the purpose of the stop, "provided that the unrelated questioning does not extend the encounter beyond the period reasonably necessary to effectuate the purposes of the lawful detention." Id.;

7

see also Arizona v. Johnson, 555 U.S. 323, 333 (2009) (holding that a law enforcement officer's questions "into matters unrelated to the justification for the traffic stop ... do not convert the encounter into something other than a lawful seizure," provided those questions "do not measurably extend the duration of the stop"); Muehler v. Mena, 544 U.S. 93, 101–02 (2005) (holding that unrelated questioning that did not extend a seizure did not violate the Fourth Amendment). Both Mena and Johnson make clear that unrelated questioning during an investigative stop, including a traffic stop, does not run afoul of the scope component of Terry 's second prong. See United States v. Everett, 601 F.3d 484, 494 n.10 (6th Cir. 2010). Moreover, the Supreme Court has held that roadside questioning of a motorist detained pursuant to a routine traffic stop does not constitute "custodial interrogation" for purposes of the Miranda rule. See Berkemer v. McCarty, 468 U.S. 420 (1984).

If a police officer smells marijuana in the passenger compartment of a vehicle after a traffic stop, she has a justifiable reason to extend the traffic stop and probable cause to search the vehicle for contraband under the automobile exception to the Fourth Amendment. See United States v. Palmer, 820 F.3d 640, 650–51 (4th Cir. 2016); United States v. Simon, 600 Fed. Appx. 89, 91 (4th Cir. 2015) ("We have repeatedly held that an officer who smells marijuana upon approaching a vehicle during a lawful traffic stop has probable cause to search those parts of the vehicle where that marijuana may be contained.") (citing United States v. Carter, 300 F.3d 415, 422 (4th Cir. 2002)); United States v. Lewis, 606 F.3d 193, 198 (4th Cir. 2010) ("When [defendant] rolled down his window to comply, [the officer] smelled the odor of marijuana emanating from the vehicle. At that point, the officers possessed probable cause to search the vehicle."); United States v. Kellam, 568 F.3d 125, 136 (4th Cir. 2009); United States v. Humphries, 372 F.3d 653, 658 (4th Cir. 2004) ("We have repeatedly held that the odor of

8

marijuana alone can provide probable cause to believe that marijuana is present in a particular place.... While smelling marijuana does not assure that marijuana is still present, the odor certainly provides probable cause to believe that it is."); United States v. Scheetz, 293 F.3d 175, 184 (4th Cir. 2002) ("Once the car was properly stopped and the narcotics officers smelled marijuana, the narcotics officers properly conducted a search of the car.").

A canine sniff is also permissible if it is performed within the time reasonably required to perform an initial traffic stop or otherwise permitted by the articulable suspicion for an extended stop. Rodriguez v. United States, 575 U.S. 348, 358 (2015); see also United States v. Villavicencio, 825 Fed. Appx. 88 (4th Cir. 2020) (unpublished). Once a trained drug detection dog alerts on one compartment of a vehicle for the presence of drugs, officers have probable cause to search "every part of a vehicle and its contents that may conceal the object of the search." United States v. Kelly, 592 F.3d 586, 590 (4th Cir. 2010).

The Supreme Court has established three criteria for the plain view exception to the warrant requirement first recognized in Coolidge v. New Hampshire, 403 U.S. 443, 465 (1971). The plain view doctrine requires the Government to demonstrate that: "(1) the officer was lawfully in a place from which the object could be viewed; (2) the officer had a lawful right of access to the seized items; and (3) the incriminating character of the items was immediately apparent." United States v. Davis, 690 F.3d 226, 233 (4th Cir. 2012) (internal quotations omitted). "Immediately apparent" means that police have probable cause to believe an object in plain view is contraband. Minnesota v. Dickerson, 508 U.S. 366, 375 (1993). In other words, the Supreme Court has held that this condition generally requires that "there is probable cause to associate the property with criminal activity." Texas v. Brown, 460 U.S. 730, 741–42 (1983) (quoting Payton v. New York, 445 U.S. 573, 587 (1980)). It does not require an officer to

9

"know" that items are evidence of a crime, but "merely requires that the facts available to the officer would warrant a [person] of reasonable caution in the belief that certain items may be contraband or stolen property or useful as evidence of a crime...." Id. at 742 (internal quotations and citation omitted). See also United States v. Khan, 989 F.3d 806, 819 (10th Cir. 2021) (officers had probable cause to seize United States currency pursuant to plain view doctrine upon its discovery in physician's residence while executing search warrant for evidence of physician's prescription writing scheme); United States v. Key, 889 F.3d 910, 913 (7th Cir. 2018) (seizure of tablet computer, cell phones, and prepaid credit cards from the defendant's motel room was permissible under plain view doctrine where officers had obtained defendant's permission to search room for missing minor); United States v. Ballard, 551 F. App'x 33, 38–39 (3d Cir. 2014) (boxes in defendant's rented storage unit which contained over 500 credit report printouts, as well as variety of personal identifying information and identifications cards that were not in defendant's name came within plain view doctrine); United States v. Hamie, 165 F.3d 80, 83 (1st Cir. 1999) (agents had probable cause to seize licenses and other documents relating to defendant pursuant to the plain view doctrine while executing a search warrant for evidence of fraud by defendant's roommates).

Therefore, cash, credit cards, and other evidence of credit card fraud lawfully seized in plain view pursuant to a vehicle search based on probable cause to believe that drugs are in vehicle can subsequently be used in a prosecution for bank fraud and money laundering. See Villavicencio, 825 Fed. Appx. at 90 (100 credit cards, skimming device, master key for gas pumps, and fake identification card seized in a traffic stop on reasonable suspicion of drug activity were properly admitted in prosecution for illegal possession of access devices and aggravated identity theft).

10

**III. Discussion**

Defendant moves to suppress all evidence obtained during the 2017 traffic stop, arguing that the Government's seizure of the credit cards and other items that led to the current charges violates the Fourth Amendment. The Court denies the motion to suppress. Contrary to Defendant's arguments, Trooper Petrof's dash cam clearly shows Defendant's rented Ford Mustang crossing from the passing lane to the driving lane without a turn signal in violation of Pennsylvania Vehicle Code, Section 3334(a). Observing this violation, Trooper Petrof properly stopped Defendant's rental car. Trooper Petrof then properly detained Defendant long enough to ask for his license, registration, and insurance and to run a computer check. United States v. Foreman, 396 F.3d at 781. Trooper Petrof was also permitted to ask other questions whether or not related to the purpose of the traffic stop. See Arizona v. Johnson, 555 U.S. at 333.

When Trooper Petrof leaned in to talk to Defendant from the passenger seat side of the car, he immediately detected the strong odor of marijuana. This occurred seconds after he approached Defendant's car and well within the time permitted to conduct a traffic stop. Trooper Petrof's verbal articulation of his suspicion that Defendant possessed marijuana in his car was recorded on his dash cam. Moreover, Defendant confirmed Trooper Petrof's suspicion by admitting that he had a "blunt" in the car. At that point, Trooper Petrof was permitted to extend Defendant's detention to investigate illegal drug activity based on the specific and articulated fact that Defendant's car reeked of marijuana and Defendant said he a "blunt" in the car. See United States v. Palmer, 820 F.3d at 650–55. The marijuana odor and Defendant's admission also provided Trooper Petrof with probable cause to search the vehicle for illegal drugs. Id.

To support the motion to suppress, Defendant relies on the Fourth Circuit's opinion in United States v. Bowman, 884 F.3d 200, 209 (4th Cir. 2018). In Bowman, the defendant was

11

stopped for speeding and weaving over the fog line after the officer received a tip from the Drug Enforcement Agency that a car matching the description of the defendant's car was transporting methamphetamine. Id. at 205. After completing the necessary tasks for the traffic stop, the officer briefly detained Bowman in his patrol car while he questioned a passenger. Id. at 207. Receiving inconsistent answers from the passenger, the officer summoned a K-9 unit to sniff Bowman's car. Id.

The Fourth Circuit determined that the officers in Bowman did not have a reasonable, articulable suspicion to extend their traffic stop in order to summon a K-9 unit. Id. at 218–19. Unlike the facts in this case, however, the officer who stopped Bowman did not smell marijuana, and the occupants of Bowman's vehicle did not indicate that they were carrying drugs or otherwise violating the law. Id. at 208. Here, not only did Trooper Petrof immediately smell marijuana, but Defendant confirmed that he possessed it in the car. As that point, it was entirely proper for Trooper Petrof to order Defendant out of the car to conduct a pat-down and search the car. The dash cam clearly records Trooper Petrof's radio transmission to the PSP dispatcher stating that his reason for stopping Defendant was then extended to include a drug investigation. For these reasons, Trooper Petrof's extended detention of Defendant to conduct a canine sniff of his car did not violate the Fourth Amendment. See Lewis, 606 F.3d at 198.

Nor did Trooper Petrof exceed his authority when patting Defendant down for the presence of weapons. First, Defendant volunteered that he had $50,000 in the car. Defendant then produced a large wad of credit cards from the pocket of his wind pants. Defendant further stated—"Can I tell you where everything is?"—after which he admitted that he had nine grams more of marijuana in the car than he had earlier disclosed.

12

Immediately thereafter, Trooper Petrof's K-9 Eric alerted on the center console of Defendant's rental car—where a blunt was located—and the black bag on the rear seat—where Defendant admitted he had placed an additional nine grams of marijuana and $50,000 cash. These uncontroverted facts gave Trooper Petrof probable cause to search anywhere in the car where contraband could be found. Kelly, 592 F.3d at 590.

Once Trooper Petrof had probable cause to search the backpack where Defendant kept his cash and marijuana, he properly seized the 74 magnetic cards, 38 money grams, electronic card reader, and numerous merchandize receipts that were also in the bag. These items were in plain view during Trooper Petrof's lawful search of the bag for drugs and are evidence of the credit card fraud scheme described by Special Agents Fischer and Pope. The Fourth Circuit recently rejected arguments that 100 credit cards, a skimming device, a master key for gas pumps, and a fake identification card should have been suppressed because the officer unreasonably extended a traffic stop to conduct a search for suspected drug activity. United States v. Villavicencio, 825 Fed. Appx. 88, 90 (4th Cir. 2020). As in this case, the reason for the extended traffic stop in Villavicencio was drug-related, whereas the items seized revealed different crimes—illegal possession of access devices and aggravated identity theft. Id.

Here, Trooper Petrof immediately recognized the incriminating nature of Defendant's possession of over $65,000 in cash and dozens of credit cards, gift cards, and money order receipts. He knew they were evidence of some type of credit card scheme, even if he did not immediately know they were evidence of a credit bust-out scheme. Before seizing this evidence, Trooper Petrof asked defendant why he had so many credit cards, his overall credit debt, and why his money was wrapped in packaging. At the PSP station house, Trooper Petrof continued to press Defendant on the large number of credit cards and how he paid his credit card bills from

his employee as a clinical lab subject. Trooper Petrof called Special Agent Pope, who requested scanned copies of the credit cards, money orders, and receipts. As the Supreme Court held in Texas v. Brown, 460 U.S. at 741–42, the "immediately-apparent" prong of the plain-view doctrine does not require an officer to "know" that items are evidence of a crime, but "merely requires that the facts available to the officer would warrant a [person] of reasonable caution in the belief that certain items may be contraband or stolen property or useful as evidence of a crime...." Id. Trooper Petrof's actions and words meet this criterion.

In sum, Trooper Petrof was allowed to detain Defendant after witnessing him commit a traffic violation. During this detention, he formed a "reasonable suspicion" of ongoing criminal activity—i.e., possession of marijuana—permitting Defendant's extended detention. See Branch, 537 F.3d at 332. Probable cause for Trooper Petrof's search of Defendant's rental vehicle under the automobile exception to the Fourth Amendment included the odor of marijuana in the car, Defendant's admission that he possessed a blunt, Defendant's statement that he had $50,000 cash, the wad of credit cards in his pants pocket, Defendant's subsequent admission that he had more marijuana in a bag on the rear seat of the car, and the K-9 alert on the center console and bag on the rear seat. Once Trooper Petrof's search of the rental car and its contents was justified under the automobile exception, the plain view doctrine justified his seizure of the cash, 74 magnetic cards, 38 money grams, electronic card reader, and numerous merchandize receipts that were also in the bag. See e.g., United States v. Matthews, 422 F. Supp. 3d 1235 (W.D. Ky. 2019) (plain view doctrine justified officer's seizure of a firearm under the car seat where automobile exception gave officer lawful right to access the firearm during a search for marijuana following a traffic stop). The large amount of cash, Defendant's admissions that he obtained the cash from his credit cards and did not always pay his credit card debt, as well as the presence of a credit

card reader, made the incriminating nature of these items readily apparent. Therefore, the Government's seizure of these items in plain view during Trooper Petrof's search for marijuana and drug proceeds does not violate the Fourth Amendment.

Finally, the Court notes that Defendant testified at the suppression hearing. In his testimony, Defendant denied having any drugs in the car, denied telling Tropper Petrof that he had drugs in the car, and he also accused Petrof of altering the videotaped footage of the stop. The Court observed Defendant's demeanor on the stand and finds that Defendant is not worthy of belief. A review of the videotape clearly shows that, contrary to Defendant's testimony, he did tell Trooper Petrof that there were drugs in the car. The trooper's testimony at the suppression hearing about what happened during the stop is backed up by the video. Defendant's testimony at the suppression hearing, in the face of the uncontestable video footage, simply defies credibility. In sum, the evidence in this case is clear that this was a lawful stop, and the evidence found in the vehicle was in plain view and found incident to a lawful search.

## IV. Conclusion

For the reasons stated herein, the Court finds that there was no Fourth Amendment violation and denies Defendant's Motion to Suppress.

**ORDER**

**IT IS, THEREFORE, ORDERED** that defendant's Motion to Suppress, (Doc. No. 36), is **DENIED**.

Signed: June 2, 2021



Max O. Cogburn Jr
United States District Judge